IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


UNITED STATES OF AMERICA        *
ex rel. MITRA RANGARAJAN        *
                                *
v.                              *    Civil Action No. WMN-12-1953
                                *
JOHNS HOPKINS HEALTH SYSTEM     *
CORP. et al.                    *
                                *


  *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

                                *
MITRA RANGARAJAN                *
                                *
V.                              *    Civil Action No. WMN-13-3630
                                *
JOHNS HOPKINS UNIVERSITY        *
                                *


  *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

                                *
MITRA RANGARAJAN                *
                                *
V.                              *    Civil Action No. WMN-17-807
                                *
JOHNS HOPKINS HEALTH SYSTEM     *
CORP. et al.                    *
                                *


**MEMORANDUM**

On October 31, 2016, Defendants[1] in consolidated cases Civil

Actions WMN-12-1953 and WMN-13-3630, filed a Motion for Summary

---

[1] Defendants in these actions are three institutional entities:
Johns Hopkins Health System Corporation; Johns Hopkins Hospital,
Inc.; and Johns Hopkins University and one individual, Dr.
Anthony Kalloo.

Judgment.  ECF No. 112.[2]  After Plaintiff filed her opposition to

that motion, ECF No. 121, Defendants filed a motion to strike

that opposition, to stay further briefing of the summary

judgment motion, and to dismiss Plaintiff's action with

prejudice as a sanction.  ECF No. 131.  Defendants based that

motion for sanctions on the contention that Plaintiff has

flagrantly violated the Federal Rules of Civil Procedure

governing both discovery and summary judgment practice.  Finding

that Defendants' motion raised some serious issues regarding

Plaintiff's compliance with the applicable rules, the Court

stayed further briefing of the summary judgment motion until the

motion for sanctions could be briefed and resolved.  ECF No.

132.  The motion for sanctions is now fully briefed.  Upon

review of the pleadings and the applicable case law, the Court

determines that no hearing is necessary, Local Rule 105.6, and

that the motion for sanctions will be granted and that all three

of the above captioned actions will be dismissed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Mitra Rangarajan applied for a position as a

nurse practitioner in the Division of Gastroenterology and

Hepatology (the GI Division) at the Johns Hopkins University

School of Medicine in 2007.  While she had recently received a

---

[2] Unless otherwise indicated, citations to ECF Nos. will be to
filings in Civil Action WMN-12-1953.

Master of Science in Nursing from the Johns Hopkins University, she had yet to be credentialed as a nurse practitioner so she was hired as a registered nurse and began work in November of 2007.  She was hired at an initial salary of $65,000 but she contends that she was promised a salary of $95,000 once she became credentialed as a nurse practitioner.  Plaintiff was credentialed as a nurse practitioner in 2009 and was given periodic increases in her salary but her salary never rose to the level she alleges she was promised.

In Defendants' view, Plaintiff's performance did not live up to her paper qualifications.  Plaintiff had attendance and tardiness issues, she failed to timely check for test results and follow up with patients, and her notes in medical histories were often disorganized and unreliable.  In response to a round of negative performance reviews, Plaintiff was placed on a performance improvement plan in January of 2011.  Before that plan could be fully implemented, Plaintiff demonstrated poor judgment in the care of a patient that Defendants assert could have had catastrophic results for that patient.  In response to those concerns, Dr. Anthony Kalloo, the director of the GI Division, suspended Plaintiff's clinical privileges.  In response to that suspension, Plaintiff resigned her position on or about May 6, 2011.

3

In Plaintiff's view, she was at all times a stellar and exemplary health care provider, while those around her failed to follow up with patients, lost pathology specimens, and engaged in fraudulent billing practices.  She also complains that she was treated unfairly by her supervisors and coworkers.  Chief among her complaints are the following: she was denied the $95,000 salary that she was allegedly promised; she was assigned unmanageable workloads; she was not provided the training she needed to advance her career while Dr. Kalloo showed favoritism and provided those opportunities to another Nurse Practitioner, Monica Van Dongen; Plaintiff applied for but was denied permission to participate in a Nurse Practitioner Fellowship Program; while she was accepted into a Doctor of Nursing Practice (DNP) program, once in the program she was treated unfairly by the program director, Dr. Mary Terhaar; she was given an undeserved failing grade by the Capstone professor in the DNP program, Dr. Julie Stanik-Hutt; and, she was denied vacation leave and reimbursement for attending professional conferences.  Plaintiff identifies Dr. Kalloo and his assistant, Tiffany Boldin, as leading the conspiracy to mistreat her, but, in her view, most if not all of the other individuals in the GI Division were also involved in the conspiracy to set her up for failure.

In response to this alleged mistreatment, Plaintiff has now filed four lawsuits.  In the first lawsuit, Civil Action WMN-12-1953, Plaintiff alleges that this mistreatment was in retaliation for her protesting fraudulent billing practices.  In that suit, she brought retaliation claims under the federal False Claims Act and the Maryland False Health Claims Act. Plaintiff originally also brought claims in that action as a putative relator under those same acts but, after the United States and the State of Maryland gave notice of their decisions not to intervene in the false claims aspects of the First Amended Complaint, Plaintiff voluntarily dismissed those claims. In the second suit, Civil Action WMN-13-3630, Plaintiff attributes the same conduct, not to retaliation, but to discrimination on the basis of her race, national origin, sex, and age and asserted claims under Title VII of the Civil Rights Act of 1964.  The Court consolidated these first two cases on September 16, 2016.  ECF No. 107.

Before those two cases were consolidated, Plaintiff's counsel moved to amend the complaint in Civil Action WMN-12-1953 to restore the substantive false claims act claims.  The Court denied that motion on April 14, 2015, on the grounds of both undue delay and undue prejudice.  ECF No. 66.  Plaintiff's counsel then proceeded to assert those same claims in a third action filed on May 14, 2015, Civil Action WMN-15-1394.  This

action was filed as a relator action and under seal, despite the fact that the United States and the State of Maryland had already declined to intervene on these same claims.  Plaintiff's counsel allowed this case to remain under seal and unserved for over a year and a half.  On January 18, 2017, the Court issued an order requesting Plaintiff's counsel to show cause why that case should not be dismissed.  In response to the Court's show cause order, Plaintiff's counsel acknowledged that the action should never have been filed as a qui tam action and requested fifteen days to file an amended complaint only in the name of Plaintiff.  Civ. No. WMN-15-1394, ECF No. 5 at 2.

On February 2, 2017, this Court issued a memorandum and order dismissing Civil Action WMN-15-1394.  In dismissing that case, the Court noted that,

> Plaintiff's counsel's failure to properly file this
> case so that Defendants would have notice of the
> filing, and then letting it languish for over a year
> and a half, has resulted in claims that, if permitted
> to go forward, would relate to transactions that took
> place as long as nine years ago.  Plaintiff's counsel
> provides no explanation for his delay and the Court
> concludes that he has not shown good cause as to why
> this case should not be dismissed for want of
> prosecution.

Civ. No. WMN-15-1394, ECF No. 6 at 3.[3]

---

[3] The Court is particularly troubled that Plaintiff's counsel participated in a settlement conference in the first two consolidated cases on November 18, 2015, before Magistrate Judge Stephanie Gallagher.  While engaging in this settlement discussion, supposedly in good faith, Plaintiff's counsel was

Plaintiff's counsel did not file a motion to reconsider the dismissal of Civil Action WMN-15-1394, nor did he file an appeal of that decision.  Instead, on March 23, 2017, he filed a fourth action on Plaintiff's behalf, Civil Action WMN-17-807.  This action is essentially identical to the just-dismissed action and, remarkably, was brought as a qui tam action on behalf of the United States and the State of Maryland, again ignoring the fact that the United States and the State of Maryland[4] had already declined to intervene on these same claims.  On May 11, 2017, Defendants filed a motion to stay their obligation to respond to the Complaint in Civil Action WMN-17-807 until the Court rules on the pending motions in the first two consolidated actions.  The Court granted that motion to stay on May 18, 2017.

## II. DISCUSSION

As explained more fully below, Defendants premise their motion for sanctions on four particular aspects of Plaintiff's conduct in discovery and in opposing the summary judgment

---

maintaining this third action improperly undisclosed and under seal against the same defendants.

[4] In response to a letter sent to the Court by Defendants in which Defendants noted the duplicitous nature of Civil Action No. WMN-17-807, Plaintiff's counsel challenged Defendants' representation that the State of Maryland had declined to intervene, asserting that "[t]here is no information on the docket which confirms that the State of Maryland declined to intervene in Civil Action No. 12-cv-1953."  ECF No. 139 at 4. To the contrary, on January 13, 2014, the State of Maryland filed a "Notice of Election to Decline Intervention and Request for Dismissal of Maryland's Claim."  ECF No. 11.

motion.  First, Plaintiff has advanced an unsupported and
unsupportable claim that the video-recording and transcript of
her deposition were edited both to change the substance of her
testimony and to make her appear less articulate.  Second,
Plaintiff submitted with her opposition a 54-page declaration
which includes factual contentions that were never disclosed in
discovery.  Third, Plaintiff submitted with her opposition
exhibits containing highly relevant documents that were
requested in discovery but never produced.  Fourth, a review of
documents produced by Plaintiff indicates that Plaintiff may
have withheld thousands of additional responsive documents from
discovery.

## A. Plaintiff's Counsel's Reluctance to File the Opposition

Before addressing the concerns raised by Defendants, the
Court notes that it appears that Plaintiff's counsel had his own
concerns and misgivings about the content of the opposition to
Defendants' summary judgment motion, at least as to what
Plaintiff wanted him to include in that opposition.  Defendants
filed their motion for summary judgment on October 31, 2016.  On
November 10, 2016, Plaintiff's counsel filed a motion for a two-
week extension of time to file his opposition based in part on
the length of the motion - it was 42 pages long with 99
exhibits.  ECF No. 113.  Defendants consented to the extension,
ECF No. 114, and the Court granted the motion.  ECF No. 115.  On

December 1, 2016, Plaintiff's counsel filed a second motion for
an extension of time to file the opposition, to which Defendants
also gave their consent, this time asking for just a two day
extension and reporting that "Plaintiff prepared notes containing
information she wished to be included in the opposition, but her
computer crashed on November 29, 2016, and she lost all of her
notes." ECF No. 116 at 2. The Court granted that motion.
Plaintiff's counsel filed a third motion for an extension on
December 5, 2016, this time for a one day extension, explaining
that other commitments rendered him "unable to complete the
opposition and get it approved by the client." ECF No. 118 at 2.
The motion was granted and the time in which the opposition was to
be filed was extended through December 6, 2016.

On December 7, 2016, Plaintiff's counsel filed a Notice in
which he stated that he "wishe[d] to advise the court why the
opposition has not been filed." ECF No. 120 at 1. He explained
that, after having spending a few hundred hours working on the
opposition, he had completed it and the exhibits, including a
declaration from Plaintiff, on December 6, 2016. Counsel then
stated that "Plaintiff had additions and revisions to her
declaration which will result in changes to the opposition, and
Plaintiff and her counsel are not in agreement with the final
content of the opposition." Id. at 1-2. Counsel indicated that if
his differences with Plaintiff could not be resolved, he would file

a motion to withdraw and allow Plaintiff to file her opposition pro se.

Even before receiving that explanation from Plaintiff's counsel regarding the reasons for the delay in filing the opposition, the Court received an ex parte communication from Plaintiff herself indicating that there was some disagreement between her and her counsel.  On December 2, 2016, the undersigned received a letter from Plaintiff in an envelope addressed "Strictly Confidential Documents for Honorable Judge Nickerson's Eyes Only." That letter focused on her belief, detailed more fully below, that her deposition had been improperly edited.  She also stated in that letter that her counsel had told her that he would like to withdraw and that she "should have retained different counsel." Significantly, the letter also indicated that it was copied to Plaintiff's counsel and, if indeed it was, counsel was aware that his client was sending ex parte communications to the Court but took no action.

Whatever disagreements existed between Plaintiff and her counsel must have been sufficiently resolved to permit Plaintiff's counsel to file an opposition to the summary judgment motion later in the day of December 7, 2016.  The opposition that was filed was 104 pages in length.  The "Facts" portion of the opposition extended from page 2 through 68, and was taken virtually word for word from Plaintiff's 54-page Declaration that was submitted with the opposition.  ECF No. 121-2.

## **B. Plaintiff's Efforts to Change Her Deposition Testimony**

Plaintiff's deposition was taken on August 9, 2016. On November 28, 2016, more than three months later and almost a month after Defendants filed their summary judgment motion, Plaintiff's counsel forwarded to the court reporting service a 51-page "Errata Sheet" that he states was "provided by Ms. Rangarajan." ECF No. 131-3 (email forwarding Errata Sheet). At the beginning of this Errata Sheet, Plaintiff states,

> The court reporters' office has informed me that they
> edited my video, audio and typed deposition
> transcripts. It is clear that key testimony is
> deleted, altered, cloned from various sound bites
> etc., to accomplish two things. 1. Change the
> testimony 2. To induce grammar mistakes thus making me
> sound as if I am speaking broken English.
>
> I was unaware that court reporters were allowed to
> edit the deposition transcripts prior to the deponent
> reviewing the transcript.

Id. at 2.[5] Plaintiff then proceeds to set out in her Errata Sheet almost 500 corrections, comments, and proposed additions to the transcript.

A few of Plaintiff's notations do reflect actual transcription errors, but those errors are inconsequential and none seriously altered the content of Plaintiff's testimony. For example, in response to a question as to why she believes she was discriminated against on the basis of her race,

---

[5] When citing this Errata Sheet, the Court will cite to the bracketed numbers on the bottom of the page.

Plaintiff responded, "[t]here is a general perception that Indian woman (sic) are subservient and will serve as an inferior supplicant."  Plaintiff correctly points out that the transcript incorrectly transcribed "general perception" as "gender perception."  ECF No. 131-3 at 6 (referencing Pl.'s Dep. Tr. at 55).  In a portion of the deposition where Plaintiff is questioning a document that was presented to her, she queries why the author of the document used a "stamped signature." Plaintiff complains that in two of Plaintiff's answers, the court reporter mis-transcribed her as saying "stamp signature." ECF No. 131-3 at 14 (citing Pl.'s Dep. Tr. at 206, lines 9 and 14).  The Court notes that the court reporter also made the same transcription error when transcribing counsel's question, Pl.'s Dep. Tr. at 206, line 8, but again, there is no consequence to these minor transcription errors.

There is one transcription error that was potentially substantive.  Plaintiff was presented in her deposition with a letter written by one of the physicians with whom Plaintiff worked, a Dr. Marcia Canto, in which Dr. Canto stated that she was not satisfied with Plaintiff's performance and that she was no longer interested in working with Plaintiff.  When Plaintiff was asked if she remembered Dr. Canto expressing her dissatisfaction with her, Plaintiff responded "[s]he was never dissatisfied with me."  Plaintiff correctly notes that the court

reporter inaccurately transcribed her response as "[s]he was never satisfied with me." ECF No. 131-3 at 14 (citing Pl.'s Dep. Tr. at 204, line 21). Counsel's follow-up question, however, which was accurately transcribed, removed any potential confusion. "Q. So why do you think she wrote this letter saying that she was dissatisfied with you?" Pl.'s Dep. Tr. at 205, line 1.

Plaintiff repeats throughout her Errata Sheet that the court reporter somehow edited out parts of her testimony or the questions asked of her and then proceeds to instruct the court reporter to "put back" the omitted material into the videotape and transcription. In some instances, Plaintiff appears to simply misunderstand the court reporter's use of ellipses and dashes. The court reporter would use these punctuation marks when Plaintiff or counsel would pause, restart a sentence, or fail to complete a sentence. See, e.g., Pl.'s Dep. Tr. at 19, lines 17 ("But this was a — there was a — she neglected to mention the negotiated salary"). Reviewing the videotape of the deposition clearly shows that this was an accurate transcription of what was said. Plaintiff, however, suggests that the dashes somehow replaced significant portions of her testimony:

> I need to know what I said. I believe I may have raised the discrepancy between the letter I received and the letter I was reading at the deposition. I remember mentioning that the letter I received stated Research Nurse and not Clinical Nurse. I want to know

13

what is it that I said.  That response is totally
missing No one should edit out what I stated, it is
simply wrong.

ECF No. 131-3 at 3.  She then instructs, "[p]lease put back what

you edited out."  Id.

The court reporter, however, used the same conventions when

transcribing the questions of counsel.  For example, when

Defendants' counsel stopped and restarted a question or was

interrupted by Plaintiff, the reporter signaled the restart or

interruption with dashes.  See, e.g., Pl.'s Dep. Tr. at 32,

lines 9-13 ("Q.  Did — and each time that you solved this alert

you called IT?  A.  I called IT.  I called IT.  Q.  And they

resolved the problem and gave you —   A.  They resolved the

problem.").  Any sensible review of the transcript would reveal

that there was no nefarious plot on the part of the court

reporter to make Plaintiff appear inarticulate.  Plaintiff

insists, however, that the court reporter "[p]ut back whatever

it is that you edited out.  I need to know what she said in that

question.  It is incomplete."  ECF No. 131-3 at 4.

Plaintiff also repeatedly asserts that the court reporter

somehow moved her answers to questions to entirely different

places in her deposition.  For example, in the context of a

series of questions where Defendants' counsel was trying to ask

Plaintiff where she had looked for responsive documents during

14

discovery, this exchange occurred as reflected in the
transcript:

> Q.      Where did you look?
>
> A.      Where did I look?
>
> Q.      Uh-huh.
>
> A.      What did you ask me for, if you can recollect
> what you asked me for then I'll tell you where I
> looked.
>
> Q.      I don't remember --
>
> A.      You don't remember.
>
> Q.      I'm --
>
> A.      I want to help you.  Please tell me.

Pl.'s Dep. Tr. at 26, lines 1-9.  In her Errata Sheet, Plaintiff
instructs the court reporter to remove that last answer: "Remove
the response," "I recall I gave this response for a different
question on page 43, line 16."  ECF No. 131-3 at 3.  The Court
finds it astonishing that Plaintiff, months after the deposition
took place, insists that she remembers with such certainty the
exact question to which she gave this relatively innocuous
response.

Towards the end of her "Errata Sheet," Plaintiff not so
much challenges the accuracy of the transcription, but begins to
simply add "clarifying information" to her deposition testimony.
When asked about the relationship between what occurred in the

context of a Doctorate of Nursing Program (DNP) in which

Plaintiff had enrolled and what was happening in the GI Division

in which she was employed, Plaintiff responded:

> A.    Right.  There is an interrelationship,
> interconnection.  I reported to Allison Boyle in, you
> know, in August I made a phone call to Allison Boyle.
> I think I made two phone calls.  I met with her in
> September.  I, you know, gave her the written.
>
> But before that, even before that, look at the
> sequence of events.  In May I get accepted 26th or so.
> And first week of June my schedule is changed.  It's
> an unprecedented schedule that anybody would have.

Pl.'s Dep. Tr. at 337.  In her Errata Sheet, Plaintiff instructs

the court reporter to replace that answer with the following:

> What happened to me in the DNP Clarifying program and
> what was happening in my work in the GI division are
> interlocked, intertwined and interconnected.  I
> reported to Allison Boyle in August.  I made at least
> two phone calls to Allison in August, I met her in
> person in September and gave the written complaint as
> well.  Dr. Kalloo planted the seed in May 2010, to
> destroy me in the DNP program.  In May 2010, I got
> accepted to the program.  In June my schedule changed.
> It was the most brutal schedule unprecedented in the
> history of Hopkins or any healthcare entity.

Plaintiff not only attempts to embellish her testimony

regarding the mistreatment she allegedly suffered, but also

seeks to elaborate on the deficiencies that she perceives in her

co-workers and supervisors.  When explaining in her deposition

why she was given a bad grade on her Capstone project by her

Capstone professor, Julie Stanik-Hutt, Plaintiff testified: "...

I tried to explain it all and this was complete.  I don't know,

16

this is, this has definitely, it's not a grade I deserve.  It's not a grade I should have gotten." Pl.'s Dep. Tr. at 341, lines 18-21.  In her Errata Sheet, she instructs the court reporter to replace that testimony with the following:

> I tried to explain the project in simple terms and Julie just did not get it.  She simply lacked the intellect to comprehend the concept.  She is from the old school and does not understand technology.  I did not deserve the grade she gave.  She gave me full marks for the organization, scholarly etc., of the project and then gave a failing grade for the overall paper.  Her grading did not make sense.

ECF No. 131-3 at 38.

Remarkably, well after the motion for sanctions was fully briefed, Plaintiff's counsel submitted on Plaintiff's behalf a "Notice of Plaintiff's Analysis," in which "Plaintiff respectfully requests the Court review her analysis of the video of her deposition." ECF No. 141 at 1.[6]  Attached to that notice was a 22-page document that begins with a list of 24 "Key Points" that Plaintiff asserts support her belief that the video files provided to the Court and to Plaintiff "are not the copies of the video files from the original recording." ECF No. 141-1

---

[6] As initially presented to the Court, the document was unsworn. On May 25, 2017, Plaintiff submitted a sworn copy of her "Analysis" about which she declares that "this is my independent analysis of my deposition and I did not seek the assistance of anyone in preparing the document." ECF No. 144-1.

17

at 2.[7]   The document then notes several hundred places in the
video that Plaintiff believes were somehow edited, enhanced, or
otherwise altered.

The intended significance and import of most of Plaintiff's
notations are not immediately clear to the Court.   She states
numerous times that "the film moves"[8] and that she hears the
sound of a tape winding.   See, e.g., ECF No. 141-1 at 5, 7, 8,
9.   She comments that the video shows her smiling at times when
she did not remember smiling like that.   Id. at 7.   She
complains that you can hear counsel clearing her throat when
"[s]he never cleared her throat during the deposition."   Id. at
11.   She opines that "her recollection of the deposition was
that the attorney, Ms. Rodriguez did not speak so fast and
curt," id. at 14, and that Plaintiff's voice is "clearly
enhanced."   Id. at 4.   She is particularly concerned that the
audio of the deposition was altered to include the whispering of

_____

[7] As submitted, this document has no page numbering.   When citing
this document, the Court will reference the page number in the
header generated when the document was docketed in the CMECF
system.

[8] In her "Key Points," Plaintiff states that "[t]here are several
places in the Video where the frame is moving.   The Video camera
was on a tripod and I did not see the Videographer moving the
camera around."   Id. at 4.   The video does show a very slight
movement in those instances but it also shows that Plaintiff is
not looking at the camera at those times.   It is also likely
that the tripod was simply motorized to permit the camera to pan
left and right.

one of Defendants' attorneys, Robert Smith, to establish that he
was in the deposition at a time after Plaintiff believes he had
left the room.  Id. at 8.[9]

Plaintiff complains that the videotape was also altered to
eliminate the eloquence of her answers.  Of one portion of her
testimony, she avers,

> [m]y testimony was quite strong that there was a stoic
> silence.  They have edited out the sentence, because
> my emotions and expressions would portray the high
> level of ethics and integrity on my end.  The male
> attorney was standing across at an acute angle facing
> me and there was stoic silence and his expression
> revealed emotions as if to say, "how or why did they
> do this to her.  Or you poor thing."  The female
> attorney needed time to compose herself and she could
> not make any eye contact with me.

Id. at 20.  See also, id. at 21 ("I gave a very beautiful answer
that has been edited out.").

In their motion for sanctions, Defendants complain that
Plaintiff is attempting to fundamentally change the substance of
her deposition testimony.  This, they maintain, runs counter to
the provisions of Rule 30(e) of the Federal Rules of Civil
Procedure.  Rule 30(e) permits, as Defendants acknowledge, a
deponent "to review the transcript" and, "if there are changes in

---

[9] Defendants explain that Mr. Smith had to leave Plaintiff's
deposition to travel to Johns Hopkins Hospital to prepare Dr.
Kalloo for his deposition.  Defendants submitted time stamped
receipts from Uber that demonstrate conclusively that Mr. Smith
left the deposition and returned to the deposition at the times
indicated on the video and in the transcript of Plaintiff's
deposition.  ECF Nos. 145-2 and 145-3.

form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1).  A growing number of courts, including this one, have imposed limits on the extent to which a deponent can substantively change his or her testimony.  These courts have interpreted the rule as "foreclosing changes that materially alter the testimony or contradict the testimony." Green v. Wing Enterprises, Inc., Civ. No. 14-1913, 2015 WL 506194, at *2 (D. Md. Feb. 5, 2015) (citing Wyeth v. Lupin Ltd., 252 F.R.D. 295, 296 (D. Md. 2008)).  "[W]here the proposed changes do not correct misstatements or clarify existing answers but instead materially change the answers or fully supplant them, such changes will be stricken and the deponent will be barred from utilizing the revised testimony at trial.  Id. (citing Wyeth, 252 F.R.D. at 297).  Plaintiff's counsel acknowledged this limitation when he instructed a third party witness during his deposition that he had a right to review the transcript of his deposition before it became final but he "would only be able to make minor corrections, maybe spellings, but no substantive changes." ECF No. 131-17, Sergey Kantsevoy Dep. at 38.

The Court finds that many of Plaintiff's proposed changes do not fundamentally change the substance of her testimony, in fact, many of the proposed changes have no substantive import at all. Whether or not a camera moved, someone is heard whispering, Plaintiff smiled in a particular way, or counsel cleared her throat, does not affect the content of Plaintiff's testimony.

While Plaintiff's proposed "corrections" to the videorecording or transcript might be an attempt to polish her testimony and perhaps render it more compelling, they would not fundamentally change the substance of that testimony.  Thus, the actual substance of her proposed changes does not seriously trouble the Court.

What does trouble the Court, however, is that Plaintiff has made frivolous and unsupportable allegations of serious malfeasance on the part of the court reporting service and that her counsel has supported her in advancing those allegations.  A representative of the court reporting service has submitted a sworn declaration that she reviewed a portion of both the transcript and videotape "to determine conclusively that they both accurately captured the deposition and that neither had been altered" and that she repeatedly explained to Plaintiff that the transcript of her deposition had been "'edited' only in the sense that the court reporter had turned her raw notes into a transcript" and that "absolutely nothing had been done to add to, delete or otherwise edit the videotape of her deposition." ECF No. 131-4.  The Court's own review of the time-stamped videotape of the deposition conclusively shows that videotape was unaltered and that the deposition was accurately transcribed with just a few insignificant transcription errors.  There is no hint of editing of the videotape and for one to perfectly execute the hundreds of edits to the videotape that Plaintiff suggests were made would require an incredible amount of time and sophistication.  Plaintiff offers no

explanation as to why a neutral third party would engage in such conduct.

It is particularly disturbing that Plaintiff's counsel attended the deposition and thus would know if there was any validity to Plaintiff's accusations.  In opposing the motion for sanctions, he ignores what he must know to be true, deflects responsibility, and simply avers that "Ms. Rangarajan believes that her deposition transcript was changed" and "she also believes that the exhibits provided by the court reporter were different than those shown to her during the deposition," and "she believes that she did not receive her original deposition video."  ECF No. 136 at 7 (emphasis added).  Plaintiff's counsel also suggests that the statement of an "expert" that he submitted with the opposition somehow confirms Plaintiff's position.  The expert, however, simply states that what Plaintiff submitted to him were not original digital video files but were copies in a compressed format.  ECF No. 136-2.  He makes no suggestion, whatsoever, that the video or audio was edited or altered.

Nothing that Plaintiff has submitted lends any credence to her claims that the videotape or transcript of her deposition was purposely altered in any way.  What Plaintiff's Errata Sheet and Analysis does establish is that Plaintiff is completely unable to acknowledge any flaws or inadequacies in her own performance or conduct.  Where flaws or inadequacies appear, Plaintiff seems willing to attribute them onto anyone else, even a disinterested

third party.  The Court suspects that Plaintiff's inexorable need
to deflect responsibility and to project it on others perhaps sheds
more light on Plaintiff's difficulties in the GI Division than any
of the actual testimony in her deposition.

## C. Plaintiff's Declaration

Plaintiff clearly was not pleased with her deposition
testimony.  In addition to her efforts to re-write that testimony,
as discussed above, she ignores it for the most part in her
opposition to the motion for summary judgment.  Instead, she
attempts to replace that testimony with the more favorable
narrative of events that she set out in her 54-page Declaration.
While she cites her deposition three times in the opposition to the
motion for summary judgment, she cites her Declaration over 750
times.

Rule 56(c)(4) of the Federal Rules of Civil Procedure does
permit a party to provide a declaration in opposing a summary
judgment motion.  Plaintiff acknowledges that a party cannot
contradict their deposition testimony by simply submitting a
declaration: "'If a party who has been examined at length on
deposition could raise an issue of fact simply by submitting an
affidavit contradicting his own prior testimony, this would
greatly diminish the utility of summary judgment as a procedure
for screening out sham issues of fact.'"  ECF No. 136 at 4
(quoting In re Family Dollar FLSA Litig., 637 F.3d 508, 513 (4th

23

Cir. 2011), emphasis added by Plaintiff).  Plaintiff's counsel contends that Plaintiff's Declaration simply supplements Plaintiff's deposition testimony, but does not contradict that testimony.

Defendants respond that Plaintiff's Declaration does, in fact, contradict some significant aspects of Plaintiff's deposition testimony.  Defendants detail two specific examples of contradictions: one involving a negative performance evaluation of her prepared by Dr. Vikesh Singh and the other concerning an email which raised concerns about Plaintiff's lack of follow up with patients of Dr. Sergey Kantsevoy.  Defendants also note numerous examples where Plaintiff's Declaration supplements Plaintiff's interactions with supervisors and administrators beyond what was disclosed in her deposition or in discovery.  See ECF No. 131-1 at 13 n.4.

As for Dr. Singh's negative evaluation, Plaintiff states in her Declaration that "Dr. Singh gave me a bad evaluation and I confronted him about its contents.  Dr. Singh admitted that Dr. Kalloo had invited him to a meeting and coached him on how to do the evaluation and even provided some information about me.  He admitted that he only wrote part of the evaluation . . . ."  Pl.'s Decl. ¶ 122.  When asked about this evaluation in her deposition, Plaintiff mentions nothing about Dr. Kalloo coaching Dr. Singh to give a negative evaluation.  Instead, she simply

questioned whether Dr. Singh really filled out the evaluation given Dr. Singh's high opinion of her - "I believe he referred to me as excellent," Pl.'s Dep at 269, 266. In opposing the motion for sanctions, Plaintiff does note that in her answer to an interrogatory seeking "all facts in detail that support your contention that Dr. Kalloo solicited doctors to complain about you" she stated that "Dr. Vik Singh told me that Dr. Kalloo invited him to his office and solicited an evaluation of me." ECF No. 131-14 at 21-22. Soliciting an evaluation is certainly a different thing than coaching the evaluator on how to do the evaluation and alleging that parts of the evaluation were completed by a different person.

Significantly, Dr. Singh testified in his own deposition that he prepared the evaluation and that no one, including Dr. Kalloo, gave him any input in his evaluation or communicated any concerns about Plaintiff. Singh Dep. at 13-15, 19. He also testified that his "Below Expectation" ratings accurately reflect his opinions concerning Plaintiff's work. He testified that her clinic notes "were not of a quality that was commensurate with a practitioner at Johns Hopkins Hospital." Id. at 21. He testified that "her notes were never done on time," and that "there was always an excuse" for that untimeliness. Id. at 23-24. He also indicated that he communicated those concerns to her. Id. at 23.

The email raising concerns about Plaintiff's follow up with Dr. Kantsevoy's patients was written by Tanya Engler and copied to Dr. Kantsevoy.  When questioned in her deposition about the email and whether she remembered there being a problem with his patients, Plaintiff responded, "Not at all.  Not at all.  This is a very good email that you brought.  Look at the date.  August 21st, 2008.  Dr. Kantsevoy left Hopkins June 30th, 2008."  Pl.'s Dep. at 172.  Plaintiff then goes on to explain that there was a concern raised about one of Dr. Kantsevoy's patients and she "directed it to Dr. Kalloo" and "Dr. Kalloo said thank you, I'll take care of it."  Id. at 173.

In her Declaration, however, Plaintiff presents an entirely different and detailed narrative of the circumstances surrounding this email, one that includes the active involvement of Dr. Kantsevoy.  She declares:

> On August 20, 2008, Ms. Engler, Dr. Kantsevoy's MOC, told Dr. Kantsevoy and I [sic] that patients were not receiving timely calls from the week before.  Ms. Engler named one specific patient then listed four others.  Dr. Kantsevoy replied and asked Ms. Engler if she was just "cutting and pasting the names" of patients who already received a call back from Dr. Kantsevoy or I [sic].  Dr. Kantsevoy personally spoke with one of the patients on the list a few days prior.  Ms. Engler then changed her answer and said "half of the patients on this list from last week had not been contacted," but failed to indicate which half.  I replied and told Ms. Engler that I already spoke with the primary patient of concern earlier that day.  Indeed I sent out an email confirmation of the conversation with Dr. Kansevoy before Ms. Engler even sent her email.  I then asked Ms. Engler if the

26

patient called back with additional concerns.  At this
point Ms. Engler became defensive because I did not
directly let her know this same-day update.  Of the
other patients, Ms. Engler gave the wrong number of
one patient.  Another patient said that he never left
a message.  Dr. Kansevoy was aware of all updates and
responded confirming his receipt of the emails within
a few hours of when the original message was sent.
Half an hour after I asked Ms. Engler for the correct
patient number, Ms. Engler emailed Ms. Boldin and Ms.
Bach to complain about my delayed answers to patient
calls.

Pl.'s Decl. ¶ 29.

The Court finds that, while Plaintiff's testimony in her

deposition and statements in her Declaration are not

diametrically opposed, reliance on the Declaration would render

the taking of Plaintiff's deposition essentially useless.  The

Declaration goes far beyond the "supplementation" of deposition

testimony permitted under Rule 56(c)(4).

## D. Documents Used to Oppose Summary Judgment Never Disclosed in Discovery

Defendants next complain that Plaintiff submitted with her

opposition to the motion for summary judgment at least 19

documents that were never produced in discovery but that were

clearly responsive to Defendants' discovery requests.  Thirteen

of those documents are emails between Plaintiff and different

employees of Defendants.[10]   Three are "screenshots" of the GI
Division schedules.[11]

While these emails and schedules are not particularly
significant, Defendants note that two other documents submitted
with her opposition but not disclosed in discovery are critical
documents relating to issues that have been at the center of
this dispute for years.  One of those documents purports to be a
September 11, 2007, letter from Plaintiff to Tiffany Boldin
memorializing the alleged agreement to automatically increase
Plaintiff's salary to $95,000 once she became a nurse
practitioner.  ECF No. 121-6 (the $95,000 Offer Letter).
Defendants have consistently denied that there ever was any such
agreement and, before this letter appeared with the opposition
to the motion for summary judgment, there was no documentation
in the record of any such agreement.  Plaintiff was specifically
asked in her deposition if that agreement was ever put in
writing and she responded, at least in one part of her
deposition, that she did not know.  Pl.'s Dep. at 46-47.

The other critical document purports to be Plaintiff's June
8, 2008, application for the GI Fellowship program.  ECF No.
121-9 (the Fellowship Application).  In Civil Action WMN-13-
3630, Plaintiff points to the denial of the opportunity for her

---

[10] ECF Nos. 121-14, 121-17 to 121-29, and 121-34.

[11] ECF Nos. 121-48, 121-54, and 121-57.

to participate in the GI Fellowship program as one of the primary examples of Defendants' discriminatory behavior.  Civ. No. WMN-13-3630, Compl. at ¶ 12.  Defendants, however, have consistently maintained throughout the administrative process and this litigation that they have no record that they ever received an application from Plaintiff for the program.  In the report of the investigation of Plaintiff's complaints conducted by Defendants' Office of Institutional Equity (OIE) in September of 2010, the investigator, Allison Boyle, states that Plaintiff acknowledged in her interview that she never actually applied for the Fellowship program, ECF No. 112-53 at 7, and, based on that testimony, the OIE concluded that Plaintiff "has not applied to that program, and accordingly has never availed herself of the possibility of receiving such training." Id. at 24.  Defendants specifically noted in their motion for summary judgment that Plaintiff failed to produce her application to the Fellowship program in discovery.  ECF No. 112-1 at 31.  Now suddenly, in opposing that motion, Plaintiff is able to produce her 2008 application.

Rule 26(e) provides that a party "who has responded to an interrogatory, request for production, or request for admission . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect,

and if the additional or corrective information has not
otherwise been made known to the other parties during the
discovery process or in writing." Fed. R. Civ. P. 26(e). Rule
37(c)(1) provides that if a party fails to provide information
as required by Rule 26(e), the party is not allowed to use that
information . . . to supply evidence on a motion . . ., unless
the failure was substantially justified or is harmless." Fed.
R. Civ. P. 37(c)(1)

Plaintiff's counsel makes no argument that these documents
are not responsive to Defendants' discovery requests.
Plaintiff's counsel also makes no claim that they were produced
in discovery, nor could he in that none of these documents bear
Bates stamps. As to the emails, counsel's explanation as to why
they were not produced is somewhat cryptic: "Plaintiff believes
that she submitted these documents to counsel during the
discovery period, but Plaintiff's counsel produced to Defendants
all documents submitted to Plaintiff's counsel." ECF No. 136 at
3 (emphasis added). See also, id. at 10 ("Ms. Rangarajan
believes that she previously provided these emails to counsel
during discovery, but counsel produced all documents provided by
Plaintiff.") (emphasis added); id. at 11 ("Ms. Rangarajan
believes that she provided all her emails to her counsel . . .
.") (emphasis added). Given counsel's awareness of Plaintiff's
expressed beliefs about the videotape and transcript of her

30

deposition, his reliance on Plaintiff's expressed beliefs regarding her compliance with her discovery obligation seems questionable at best.

The bona fides of Plaintiff's claims to have complied with her discovery obligations is further undermined by her responses in her deposition and in the opposition to the motion for sanctions. When asked in her deposition about the letter clarifying the $95,000 salary, Plaintiff responded, "I have to look, I mean, I'm sure, I'm sure I have a copy somewhere but I will look." Pl.'s Dep. at 19. That would imply that she had not previously looked for that obviously relevant document. That response led to a series of questions and answers as to where Plaintiff had looked for responsive documents in which Plaintiff was less than forthcoming. Id. at 25-30. A portion of that exchange is quoted above. Supra at 14-15. Her response continued:

> Whatever you've asked for, I've given. I believe.
> You're asking me for something I don't have your
> questions in front of me, your requests. So I have to
> tell you right now that I have honored your request
> and I've produced whichever I thought you should have.
> I gave it to my counsel. And I believe that has been
> given to you.
>
> If there's something you still need then you can ask
> me and if I have it I'll be happy to share it with
> you.

Pl.'s Dep. at 28 (emphasis added). The opposition also relates that only "[a]fter Plaintiff saw the partial production [of

31

emails] by Defendant in their Motion for Summary Judgment, she searched her records and produced the associated emails." ECF No. 136 at 10 (emphasis added).

At least as to the emails and screenshots of the GI Division schedules, Plaintiff makes the argument that her failure to produce them in discovery is harmless.[12] She suggests that because the emails were between Plaintiff and other of Defendants' employees, "Defendants should have been aware of the substance of these emails." Id. As for the schedules of the GI Division, Plaintiff proffers that "Defendants should have records of their own divisional schedule and should not have been surprised by this information." Id.

While Plaintiff made some effort to justify her failure to produce the emails and schedules in discovery, her opposition to the motion for sanctions offers no response, whatsoever, as to

---

[12] Plaintiff appears to suggest that her failure to produce the emails in discovery is justified based upon Defendants' failure to produce these same emails in discovery. Defendants acknowledged, during the discovery period, that Plaintiff's email account had been inadvertently deleted by the IT Department in December 2013 and Defendants informed Plaintiff of that deletion and the efforts they were taking to reconstruct Plaintiff's email account through the accounts of other employees. See May 5, 2016, email from Defendants' counsel to Plaintiff's counsel, ECF No. 131-8. Defendants then went to considerable expense to reconstruct Plaintiff's email account from other accounts and ultimately produced tens of thousands of pages of emails. During discovery, Plaintiff's counsel never questioned that the deletion of Plaintiff's email account was inadvertent, never questioned Defendants' efforts to recreate that account, and never filed a motion to compel any further production.

the two most critical documents, the $95,000 Offer Letter and
the Fellowship Application.  Plaintiff offers no explanation as
to why she could find them now when she was not able to find
them during discovery.  Significantly, in the motion for
sanctions, Defendants indicated that they "had reasons to
question the authenticity of at least some of these documents,"
and suggested ways that their authenticity might be validated.
ECF No. 131-1 at 22 n.6.  Plaintiff offered no response even to
that challenge.

The Court concludes that Plaintiff failed to fulfill her
discovery obligations under Rule 26(e).

**E. Additional Withheld Documents**

In the course of reviewing the documents produced by
Plaintiff, Defendants uncovered evidence that Plaintiff may have
withheld thousands of additional documents that would have been
responsive to their discovery requests.  Because some of the
emails submitted by Plaintiff were submitted as printouts of
screenshots, they reveal some of the documents and materials
that resided on the computer from which those screenshots were
taken.  Specifically, it appears that the computer contained
copies of Plaintiff's jhmi.edu email in at least two inboxes,
one of which alone contained 8,612 emails.  In a Declaration
submitted by Louis Petrovia, an Information Technology Manager
at Johns Hopkins University, Petrovia opines that other content

in the screenshots indicate that the computer was Plaintiff's home computer and the emails were accessed no earlier than July 17, 2013, which is well after Plaintiff left her employment at Johns Hopkins.  ECF No. 131-20.  Plaintiff produced just 1658 pages of documents in discovery.

After being confronted by this evidence, Plaintiff states, without any evidentiary support, that she has "thousands of items in her account, not emails" and that most of the items are irrelevant to her claims.  ECF No. 136 at 3.  She also admitted, however, that she had used a flash drive to copy her work emails to her home computer while she was still working at the hospital in response to network problems that periodically deleted her email.  Id. at 11.  In her deposition, in response to those questions as to where she looked for responsive documents and when asked if she looked in her personal computer she responded, "Yeah, I mean, if there is anything there I printed it out and gave it to you."  Pl.'s Dep. at 29.  When asked further, "A. Did you ever forward from your computer at the hospital to your home computer any emails that you received?" she answered, "You know, I did, a few emails I did."  Id.  She then explained the problem she was having with accessing her email account and explained: "I became more cognizant that I need to retain some of these documents.  So a few emails.  Not, I mean, I didn't forward all emails, just a few emails."  Id. at 31.

Of course, the forwarding of "a few" emails is a far
different thing than the copying of thousands of emails via a
flash drive.  Thus, the Court concludes that, whether or not
Plaintiff may "believe" that she had fulfilled her discovery
obligations, she clearly did not.  Furthermore, Plaintiff
failure to inform Defendants that she possessed a large portion,
if not all, of her email account caused Defendants to
unnecessarily spend the time and effort to recreate her account.

## F. The Appropriate Remedy

It is abundantly clear to the Court that Plaintiff has
flagrantly and unremittingly violated the rules governing
discovery and summary judgment motions practice.  The only
question that remains is – what is the appropriate remedy?
Under Rule 37(c)(1), the possible sanctions for the failure to
supplement discovery responses include the following:

> (i) directing that the matters embraced in the order
> or other designated facts be taken as established for
> purposes of the action, as the prevailing party
> claims;
>
> (ii) prohibiting the disobedient party from supporting
> or opposing designated claims or defenses, or from
> introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is
> obeyed;
>
> (v) dismissing the action or proceeding in whole or in
> part;

> (vi) rendering a default judgment against the
> disobedient party; or

Fed. R. Civ. P. 37(c)(1)(C) (incorporating sanctions of

37(2)(A)).

Moreover, the Court also has an inherent power to dismiss a

case where a party "'abuses the process at a level that is

utterly inconsistent with the orderly administration of justice

or undermines the integrity of the process.'" Projects Mgmt.

Co. v. Dyncorp Int'l. LLC, 734 F.3d 366, 373 (4th Cir. 2013)

(quoting United States v. Shaffer Equip. Co., 11 F.3d 450, 462

(4th Cir. 1993)).  Because of the strong policy that cases be

decided on their merits, the "greatest caution" must be

exercised before imposing the sanction of dismissal.  Shaffer

Equip., 11 F.3d at 462.  Before exercising this inherent power,

> "a court must consider the following factors: (1) the
> degree of the wrongdoer's culpability; (2) the extent
> of the client's blameworthiness if the wrongful
> conduct is committed by its attorney, recognizing that
> we seldom dismiss claims against blameless clients;
> (3) the prejudice to the judicial process and the
> administration of justice; (4) the prejudice to the
> victim; (5) the availability of other sanctions to
> rectify the wrong by punishing culpable persons,
> compensating harmed persons, and deterring similar
> conduct in the future; and (6) the public interest."

Project Mgmt., 743 F.3d at 373-74 (quoting Shaffer Equip., 11

F.3d at 462-63).[13]

---

[13] The Fourth Circuit has looked to similar factors when
considering the entry of judgment by default under Rule 37: "(1)
whether the noncomplying party acted in bad faith; (2) the

Regarding the first two factors, Plaintiff is clearly culpable and the responsibility for the lack of compliance with the pertinent rules lies primarily with her and not with her counsel. Plaintiff is not blameless. It is Plaintiff who continues the attempt to support the unsupportable contention that the court reporting service made hundreds of alterations to her deposition video and transcript. It is clear that it was Plaintiff who authored the embellished narrative contained in her Declaration.[14] It was Plaintiff who failed to turn over to her counsel documents that were clearly responsive to discovery requests and it is Plaintiff who misrepresented the amount of emails from her work email account that were stored on her home computer. While her counsel may have employed questionable judgment in not more thoroughly probing as to what Plaintiff stated she "believes" about her compliance, it appears that Plaintiff has been and continues to be the prime offender.

---

amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions." Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc., 872 F.2d 88, 92 (4th Cir. 1989) (citing Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 503-04 (4th Cir. 1977)).

[14] It appears that Plaintiff may have also drafted at least part of the actual opposition. On occasion, the opposition references Plaintiff using a first person pronoun, which would be unlikely if the opposition was drafted by counsel. See, e.g., ECF No. 121 at 54 ("Ms. Boyle confirmed that I had the lowest salary during the meeting.") (emphasis added).

As to the third and fourth factors, Defendants have been forced to expend a tremendous amount of time, effort, and expense in the discovery process and motions practice. Plaintiff's conduct has rendered much of that activity essentially meaningless.  In addition, as Defendants note, Plaintiff's conduct has impacted the dozen witnesses who could not care for patients while responding to her claims and has also depleted the resources of the Equal Employment Opportunity Commission, the Department of Education, the Department of Health and Human Services, the Department of Justice's Civil Fraud Section, the U.S. Attorney's Office, the Maryland Attorney General's Office, and this Court.

Short of dismissal, there is not another remedy that would effectively address Plaintiff's violations.  While the Court could strike the exhibits not disclosed in discovery and the portions of Plaintiff's Declaration that contradict her previous testimony, that would not address her failure to produce the thousands of emails contained on her home computer.  To fully remedy that violation, discovery would need to be reopened and it is likely that Plaintiff would need to be re-deposed and Defendants' motion for summary judgment re-briefed.  Doing so would foist considerable more expense on Defendants.  Given the history of this litigation, were discovery to be reopened, the Court has little confidence that Plaintiff's counsel would be

38

able to ensure Plaintiff's compliance with the rules of discovery.

The Court also recognizes the futility of redoing discovery and motions practice. Without ultimately deciding the merits of Plaintiff's claims, it is apparent from the current record that those claims would fail on the merits. Plaintiff's desperate attempt to disavow her deposition testimony and replace it with her Declaration is an implicit acknowledgement that her claims were unsupported under the record produced through discovery.

Furthermore, Plaintiff's Declaration is at odds with all of the other evidence in the record. The Court discussed, supra, the inconsistencies between Plaintiff's Declaration and the testimony of Dr. Singh. In the same paragraph of her Declaration where Plaintiff alleges that Dr. Singh was coached to give her a bad evaluation, she described Dr. Gerald Mullin as the only individual in the GI Division that did not distance himself from her. Pl.'s Decl. ¶ 122. Throughout her Declaration, Plaintiff describes Dr. Mullin as having a positive opinion of her and agreeing that Plaintiff was being treated unfairly. See, id. ¶¶ 55, 58, 60, 71, 115. In her answers to interrogatories, Plaintiff asserts that Dr. Kalloo asked Dr. Mullin to do a review of Plaintiff but, when Dr. Mullin indicated it would be a positive review, he never heard back from Dr. Kalloo. ECF No. 121-4 at 21.

While Plaintiff took Dr. Mullin's deposition, it is never
cited in her opposition to the summary judgment motion and,
thus, it must be assumed that none of his testimony supported
Plaintiff's assertions.   In fact, the portions of his testimony
cited by Defendants indicate that Dr. Mullin shared the same
concerns about Plaintiff's performance as the others in the GI
Division.   See Mullin Dep., ECF No. 112-44 at 28 (citing
Plaintiff's running behind in seeing patients); 29 (citing
inaccuracies in patient histories taken by Plaintiff); and 30
(citing problems with Plaintiff's punctuality).   Dr. Mullin also
does not appear to believe that Plaintiff was treated unfairly.
Id. at 38-39 (expressing his opinion that he did not believe
that Dr. Kalloo gave special treatment to Ms. Von Dongen).   When
asked how Plaintiff was treated by Ms. Boldin, Dr. Mullin's
response was simply, "[a]s per Mitra, she was cruel to Mitra."
Id. at 45.

Finally, the Court finds that the public interest is best
served by dismissal of this action.   As noted above, this
dispute and litigation has interrupted the provision of care of
numerous health care providers and impacted the resources of
this Court and several administrative agencies.   In addition,
dismissal of a case such as this, where a plaintiff's has
seriously undermined the truth-seeking function of the Court, is
appropriate "not merely to penalize those whose conduct may be

deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) (approving district court's dismissal of action under Rule 37).

Plaintiff's counsel's primary argument against dismissal is his contention that, before a court can dismiss a case for violations of discovery rules or abuses of the litigation process, it must give "'an "explicit and clear" threat to a party that failure to meet certain conditions could result in dismissal of the party's case with prejudice.'"  ECF No. 136 at 12 (quoting Franklin v. Tri-Cty. Council for the Lower E. Shore of Md., Civ. No. ELH-15-786, 2016 WL 3653966, at *3 (D. Md. July 8, 2016)).  He notes that, "[i]n addition, 'courts in the Fourth Circuit generally impose a dispositive sanction only in cases where the noncompliant party disregarded an earlier, lighter sanction, such as a protective order, a motion to compel, or the payment of attorney's fees.'"  Id. at 13 (quoting Franklin, 2016 WL 3653966, at *4).

While that general rule might apply in many cases, the Court finds it inapplicable here.  Here, it was not until after years of litigation, the closing of discovery, and Defendants' filing of their summary judgment motion that Plaintiff's failure to comply with discovery rules became apparent.  During

41

discovery, Plaintiff represented that she had produced all relevant materials in her possession and Defendants were given no reason to believe that she was not being truthful.  Although her deposition was taken on August 9, 2016, and she received the transcript of that deposition no later than November 3, 2016, Plaintiff waited until November 28, 2016, to submit her "Errata Sheet" and until May 12, 2017, to submit her "Analysis," and only after Defendants used that deposition in their motion for summary judgment.  Plaintiff's other abuses - her creation of a new narrative in her Declaration, her submission of undisclosed documents and continued withholding of relevant documents – did not occur or become apparent until Defendants filed their summary judgment motion.[15]  Thus, unlike the cases relied upon by Plaintiff, there was no occasion for the Court to issue an earlier warning.

The Court will also dismiss Civil Action WMN-17-807 for the same reasons, as well as for the reasons it dismissed Civil Action WMN-15-1394.  In his letter attempting to justify the filing of Civil Action WMN-17-807, ECF No. 139, Plaintiff's counsel makes much of the fact that the previous case was

---

[15] The Court also notes that Plaintiff's abuse of the litigation process by filing a duplicative suit and keeping it sealed for a year and a half was only revealed to Defendants after the motion for sanctions was filed and then, only by an action of the Court.

"dismissed without prejudice," but he ignores the reasons given for that dismissal.[16]  Plaintiff's still unexplained delay in pursuing that action "has resulted in claims that, if permitted to go forward, would relate to transactions that took place as long as nine years ago."  Civ. No. WMN-15-1394, ECF No. 6 at 3. Plaintiff's counsel could have appealed that dismissal, but did not.  See Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1066-67 (4th Cir. 1993) (holding that while a dismissal without prejudice is generally not appealable, "if the grounds of the dismissal make clear that no amendment could cure the defects in the plaintiff's case, the order dismissing the complaint is final in fact and [appellate jurisdiction exists]") (alteration in original, internal quotation marks omitted).

## III. CONCLUSION

For all of these reasons, Civil Action WMN-12-1953, Civil Action WMN-13-3630, and Civil Action WMN-17-708 will be

---

[16] A dismissal without prejudice is not the same as a dismissal without consequence.  For example, while a case may be dismissed without prejudice, the prosecution of a new case bringing the same claims might still be barred by limitations, regardless of the "without prejudice" dismissal.  See, e.g. Chico-Velez v. Roche Prods., Inc., 139 F.3d 56, 59 (1st Cir. 1998) (holding that "a prescriptive period is not tolled by filing a complaint that is subsequently dismissed without prejudice" and noting such a dismissal "may sound the death knell for the plaintiff's underlying cause of action if the sheer passage of time precludes the prosecution of a new case").

dismissed.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge



DATED: June 16, 2017